UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Vernon S. Broderick |
| | : | |
| v. | : | Crim. No. 15-706 |
| | : | |
| HEIDI HONG PIAO | : | |
| | : | **REDACTED** |
| | : | |

---

**SENTENCING MEMORANDUM ON BEHALF OF
DEFENDANT HEIDI HONG PIAO**

---

**Lowenstein Sandler LLP**
Michael B. Himmel
Jamie Gottlieb Furia
1251 Avenue of the Americas
New York, New York  10020
212.262.6700
*Attorneys for Defendant Heidi Hong Piao*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

I.   PRELIMINARY STATEMENT ............................................................................1

II.  PROCEDURAL HISTORY....................................................................................2

    A.   Statement of the Offense....................................................................................2

    B.   The Plea Agreement and Guidelines Calculation .............................................3

III. THE SUBSTANTIAL ASSISTANCE HEIDI PROVIDED TO THE
    GOVERNMENT SUPPORTS A DOWNWARD DEPARTURE UNDER
    U.S.S.G. § 5K1.1 OR, IN THE ALTERNATIVE, A DOWNWARD VARIANCE
    PURSUANT TO 18 U.S.C. § 3553. ......................................................................3

IV.  HEIDI'S PHYSICAL CONDITION SUPPORTS A DOWNWARD
    DEPARTURE UNDER U.S.S.G. § 5H1.4 OR, IN THE ALTERNATIVE, A
    DOWNWARD VARIANCE PURSUANT TO 18 U.S.C. § 3553.............................7

    A.   Heidi's ███████████ Constitutes an Extraordinary Physical
    Impairment .........................................................................................................7

    B.   The COVID-19 Pandemic, Coupled with Heidi's Medical Condition,
    Makes a Prison Sentence Particularly Dangerous and Potentially Fatal. ...........9

V.   APPLYING THE SENTENCING CONSIDERATIONS .................................13

    A.   The § 3553(a)(1) Factors Support a Downward Variance.................................15

        i.    Nature and Circumstances of the Offense ...............................................15

        ii.   History and Characteristics .....................................................................18

            a.   Heidi's Upbringing and Education ...............................................18

            b.   Heidi's Commitment to Her Family and Friends .........................19

            c.   Heidi's Professional Career .........................................................22

            d.   Heidi's Commitment to Community Service ...............................22

            e.   Heidi's Health ..............................................................................23

            f.   Heidi's Remorse...........................................................................23

    B.   The 3553(a)(2)–(7) Factors Support a Downward Variance. ...........................25

        i.    Reflecting the Seriousness of the Offense ...............................................25

ii.      General and Specific Deterrence ............................................................25

iii.     Unlikelihood of Recidivism........................................................................26

iv.      Availability of Non-Custodial Sentences...................................................27

v.       Avoidance of Unwarranted Sentencing Disparities ...................................27

vi.      Restitution ................................................................................................29

VI.      SPECIFIC SENTENCING REQUEST .........................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Basank v. Decker*,
   449 F. Supp. 3d 205 (S.D.N.Y. 2020)......................................................................11

*Gall v. United States*,
   552 U.S. 38 (2007).......................................................................................14, 15

*Kimbrough v. United States*,
   552 U.S. 85 (2007)............................................................................................15

*Pepper v. United States*,
   562 U.S. 476 (2011)..........................................................................................15

*Rita v. United States*,
   551 U.S. 338 (2007)..........................................................................................14

*Tapia v. United States*,
   564 U.S. 319 (2011)..........................................................................................14

*United States v. Acosta*,
   No. 06-cr-172, 2008 WL 4867815 (E.D.N.Y. Sept. 8, 2008)................................................27

*United States v. Alatsas*,
   No. 06-CR-473 (JBW), 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008).......................................8

*United States v. Austin*,
   468 F. Supp. 3d 641 (S.D.N.Y. 2020)....................................................................12

*United States v. Bell*,
   No. 11-cr-00121 (GBD) (S.D.N.Y. 2016), ECF No. 434 ..........................................................4

*United States v. Booker*,
   543 U.S. 220 (2005)........................................................................................14, 15

*United States v. Burgos*,
   Crim. No. 12-49, 2015 WL 6447766, at  *3-6 (N.D. Ind. Oct. 23, 2015) ..............................29

*United States v. Campagna*,
   No. 16 Cr. 78-01 (LGS), 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020)................................12

*United States v. Campbell*,
   12-cr-0569 (GBD) (S.D.N.Y. 2014), ECF No. 70................................................................27

*United States v. Cavera*,
    550 F.3d 180 (2d. Cir. 2008).................................................................15

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004).......................................................28

*United States v. Ferguson*,
    584 F. Supp. 2d 447 (D. Conn. 2008).......................................................29

*United States v. Figueroa*,
    421 F. App'x 23 (2d Cir. 2011) ................................................................7

*United States v. Flores*,
    465 F. Supp. 3d 251 (W.D.N.Y. 2020) .....................................................13

*United States v. Hernandez*,
    451 F. Supp. 3d 301 (S.D.N.Y. 2020).......................................................10

*United States v. Hill*,
    No. 15-cr-00769 (AJN) (S.D.N.Y. 2018), ECF No. 725 .............................3

*United States v. Ho*,
    Crim. No. 17-779 (LAP)...........................................................................5

*United States v. Hohn*,
    443 Fed. App'x 931 (6th Cir. 2011) ..........................................................7

*United States v. Jordan*,
    582 F.3d 1239 (11th Cir. 2009) ...............................................................26

*United States v. Langford*,
    516 F.3d 205 (3d Cir. 2008) (Weis, J., dissenting)....................................14

*United States v. McKillop*,
    No. 06-cr-336, 2008 WL 4862381 (E.D.N.Y. Sept. 8, 2008).....................27

*United States v. Nkanga*,
    450 F. Supp. 3d 491 (S.D.N.Y. 2020).......................................................13

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................28

*United States v. Perez*,
    No. 19 Cr. 297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020) ...........10, 11

*United States v. Pflaum*,
    No. 10-cr-01265 (JSR) (S.D.N.Y. 2013), ECF No. 13 ...............................4

*United States v. Phillips*,
   469 F. Supp. 3d 180 (S.D.N.Y. 2020)....................................................................12

*United States v. Ramos*,
   450 F. Supp. 3d 63 (D. Mass. 2020) ....................................................................11

*United States v. Robertson*,
   662 F.3d 871 (7th Cir. 2011) ...............................................................................14

*United States v. Rodriguez*,
   451 F. Supp.3d 392 (E.D. Pa. 2020) ....................................................................12

*United States v. Simon*,
   No. 18 Cr. 390-15 (PAE), 2020 WL 5077390 (S.D.N.Y. Aug. 27, 2020) ........................12, 13

*United States v. Smith*,
   454 F. Supp. 3d 310 (S.D.N.Y. 2020) ..................................................................12

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009).............................................................................4, 15

*United States v. Tidwell*,
   476 F. Supp. 3d 66 (S.D.N.Y. 2020)..................................................................8, 13

*United States v. Tomko*,
   562 F.3d 558 (3d Cir. 2009).................................................................................26

*United States v. Turkcan*,
   Crim. No. 08-428, (E.D. Mo. June 11, 2009) .......................................................29

*United States v. Ukrainsky*,
   601 F. App'x 19 (2d Cir. 2015) ..............................................................................4

*United States v. Verkhoglyad*,
   516 F.3d 122 (2d Cir. 2008)...............................................................................14

*United States v. Vitela-Aragon*,
   No. CV-19-00028-TUC-JGZ, 2020 WL 1917192 (D. Ariz. Apr. 20, 2020)............................7

*United States v. Zukerman*,
   451 F. Supp. 3d 329 (S.D.N.Y. 2020)...............................................................11, 12

*Williams v. New York*,
   337 U.S. 241 (1949)............................................................................................15

**STATUTES**

18 U.S.C. § 371...........................................................................................................3

18 U.S.C. § 666(a)(2)...................................................................................................3

18 U.S.C. § 1956(a)(2)(a) ............................................................................................3

18 U.S.C. § 1956(h) ......................................................................................................3

18 U.S.C. § 3553...........................................1, 3, 7, 9, 14, 15, 16, 24, 25, 26, 27, 28, 30

31 U.S.C. § 5314 ...........................................................................................................3

31 U.S.C. § 5322(a)–(b).................................................................................................3

U.S.S.G. § 5H1.4 .........................................................................................1, 7, 24, 30

U.S.S.G. § 5K1.1 .......................................................................................1, 3, 4, 5, 6, 9, 30

**OTHER AUTHORITIES**

Andrew Weissmann & Joshua Block, *White-Collar Defendants and White-Collar Crimes*, 116 YALE L.J. POCKET PART 286 (2007) ...........................................28, 29

Brendan Saloner, Ph.D., et al., Research Letter, COVID-19 Cases and Deaths in Federal and State Prisons, JAMA Network (July 8, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2768249 ...................................13

████████████████████████████████████████

*COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases&text=There%20are%202%2C804%20federal%20inmates,attributed%20to%20COVID%2D19%20disease (last visited Feb. 10, 2021)...................................13

David Debold, *Assessing Booker and Its Aftermath,* PRAC. FED. SENT'G GUIDELINES § 1.02 (2011) ...........................................................................29

*FAQs for Correctional and Detention Facilities*, CDC (Jan. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html#accordion-5fd10f075cc9c-card-1 ........................................12

*If You Are Immunocompromised, Protect Yourself from COVID-19*, CDC (Dec. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html.......................................................9



## I.        PRELIMINARY STATEMENT

This Sentencing Memorandum is respectfully submitted on behalf of defendant Heidi Hong Piao, who is scheduled to be sentenced by Your Honor at 12 p.m. on March 5, 2021.

We ask this Court to grant a formal downward departure, or in the alternative a downward variance, on two distinct grounds.  First, we ask the Court to take into account the extensive cooperation that Heidi has provided to the Government in its investigation beginning immediately after her arrest in October 2015, as detailed in the letter submitted by the Government pursuant to U.S.S.G. § 5K1.1.  Heidi's substantial and years' long cooperation warrants a significant departure or variance from the sentencing range as calculated by the Guidelines. Second, we ask the Court to grant a downward departure under U.S.S.G. § 5H1.4, or in the alternative, a downward variance outside the guidelines range based on the 18 U.S.C. § 3553(a) factors, in light of Heidi's current medical health.

Heidi's precarious and poor health, █████████████████████████████████████ ████████████████████████████████████ render her especially vulnerable if she is sentenced to a period of incarceration, particularly in light of the COVID-19 pandemic. Simply put, Heidi's life will be in jeopardy if she is sentenced to prison.

In addition to Heidi's extensive cooperation and medical condition, we submit that the § 3553(a) factors support a downward variance and that a sentence of time served plus supervised release is entirely fair, just, and appropriate.  Following her arrest, Heidi spent seven weeks detained at the Metropolitan Correctional Center (MCC).  Heidi has no prior criminal history, poses no realistic threat of recidivism and the needs of specific and general deterrence can be achieved through a sentence of time served.  A sentence of incarceration beyond what Heidi already served following her arrest is unnecessary here, and it would have a devastating collateral

impact on Heidi's ability to ████████████████████. Moreover, at no time during this process, which has spanned more than five years, has Heidi attempted to diminish or excuse her conduct. This is not surprising considering her character and selfless nature, as attested to by the letters to the Court attached hereto. We ask the Court, when determining the appropriate sentence, to consider the positive impact that Heidi has had on the lives of those around her.

## II.   PROCEDURAL HISTORY

### A.   Statement of the Offense[1]

In around 2012, Heidi joined her then-friend and business colleague, Shiewei (Sheri) Yan, a co-defendant in this matter, as Ms. Yan was in the process of starting the Global Sustainability Development Foundation ("GSDF") in New York. Ms. Yan had contacts within the United Nations ("UN"), and she sought to create a non-governmental organization to work with the UN President's office to advance projects and cooperative partnerships that utilized scientific and technological innovations for social good. The primary objective of GSDF was to promote educational opportunities, expand access to knowledge and information, promote socioeconomic equality, and empower the under-privileged. This is how Heidi came to meet John Ashe, who was the Permanent Representative to the UN from Antigua and, from September 2013 to September 2014, the President of the UN General Assembly. When they met, Mr. Ashe began soliciting payments.

Heidi agreed with other individuals to pay money to Mr. Ashe with the intent of influencing him, including in his official capacity – for example, so he would influence other officials and also attend a conference in China in his official UN capacity. The payments also included money that Mr. Ashe intended to give to officials in Antigua to influence their official actions – for example, so the officials would enter into a contract with a Chinese entity. Heidi's poor choices extended into her personal affairs as well, as she knowingly failed to file a Report of

---

[1]   *See also* Exhibit A, Heidi's Statement of the Case, dated January 29, 2021 ("Statement of the Case").

Foreign Bank and Financial Accounts ("FBAR") disclosing that she had financial interests in foreign bank accounts.

**B.      The Plea Agreement and Guidelines Calculation**

Heidi entered into a Plea Agreement with the United States, pursuant to which she agreed to plead guilty to conspiracy to commit bribery in violation of 18 U.S.C. § 371, bribery in violation of 18 U.S.C. § 666(a)(2), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), money laundering in violation of 18 U.S.C. § 1956(a)(2)(a), and failure to file reports of foreign bank and financial records in violation of 31 U.S.C. §§ 5314 and 5322(a)–(b). On January 14, 2016, Heidi pled guilty as charged before Your Honor.  In the allocution, Heidi readily accepted full responsibility for her conduct as described herein and in the Presentence Report ("PSR").  The PSR calculated Heidi's offense level at a 31 and a criminal history category of I, which renders an advisory sentencing range of 108 to 135 months in prison.

**III.      THE SUBSTANTIAL ASSISTANCE HEIDI PROVIDED TO THE GOVERNMENT SUPPORTS A DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K1.1 OR, IN THE ALTERNATIVE, A DOWNWARD VARIANCE PURSUANT TO 18 U.S.C. § 3553.**

A court may depart from the Guidelines range based on a motion from the Government "stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense."  *See* U.S.S.G. § 5K1.1, p.s.[2]  *See also, e.g.*, Transcript of Sentencing at 24:24–29:20, *United States v. Hill*, No. 15-cr-00769 (AJN) (S.D.N.Y. 2018), ECF No. 725 (departing from the guidelines range of 78 to 97 months' imprisonment "because of the nature and quality of the substantial assistance that [defendant] provided" and imposing a sentence of time served with four years' supervised release); Transcript of Sentencing at 14:4–15:6, *United States v. Bell*, No. 11-cr-00121 (GBD) (S.D.N.Y. 2016), ECF No. 434 (imposing a sentence of time served and 36 months' probation based on defendants'

---

[2]      The reduction for assistance to authorities under § 5K1.1 is separate and apart from the reduction for acceptance of responsibility.  *See* U.S.S.G. § 5K1.1, p.s., comment. (n.2) ("Substantial assistance is directed to the investigation and prosecution of criminal activities by persons other than the defendant, while acceptance of responsibility is directed to the defendant's affirmative recognition of responsibility for his own conduct.").

cooperation, where his total offense level was 35 for a guidelines range of 160 to 210 months); Transcript of Sentencing at 2:24–5:25, *United States v. Pflaum*, No. 10-cr-01265 (JSR) (S.D.N.Y. 2013), ECF No. 13 (finding that "the vital cooperation that [defendant] has provided" warranted a downward departure from guidelines range of 46 to 57 months and imposing a sentence of time served with two years of supervised release).  Indeed, "use of a defendant's cooperation to justify significant variances or departures from the otherwise applicable Guidelines calculations is commonplace."  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).  When the government submits a motion for a downward departure based on the defendant's cooperation, the court must consider that 5K1.1 letter when determining the sentence.  *See United States v. Ukrainsky*, 601 F. App'x 19, 23 (2d Cir. 2015) (reiterating that a "district court may not abdicate its judicial responsibility by 'refus[ing] to consider' the government's assertion of substantial assistance" (alteration in original) (citation omitted)).

Pursuant to U.S.S.G. § 5K1.1, the "appropriate reduction" for a defendant's cooperation shall be determined by the court, which may take the following factors into consideration:

1) . . . [T]he significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

2) The truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

3) The nature and extent of the defendant's assistance;

4) Any injury suffered, or any danger or risk of injury to the defendant or his or her family resulting from the assistance; and

5) The timeliness of a defendant's assistance.

*See* U.S.S.G. § 5K1.1(a).  As discussed in greater detail in the Government's § 5K1.1 letter submitted to the Court by Assistant U.S. Attorney Daniel Richenthal on February 5, 2021 (the "5K Letter"), a holistic review of each of these factors confirms that this Court should sentence Heidi in light of the factors set forth in § 5K1.1(a)(1)–(5) of the Guidelines.

*First,* the Government has evaluated Heidi's cooperation as "extensive" and "of great value in multiple, identifiable ways, in more than one case." (5K Letter at 6.)  In fact, the 5K Letter expressly states that Heidi's assistance was "highly 'significan[t] and useful[]'" to the Government in its investigation and prosecution of others." (*Id.* at 7.)  Heidi "proffered repeatedly, providing information both on previously-known subjects of investigation and on new subjects, and the information she provided was corroborated by other evidence, including documents and statements of others." (*Id.* at 6.)  Specifically, the 5K Letter credits Heidi's cooperation in three identifiable ways as "a significant factor" in:

  i.   Yan's decision to enter a guilty plea, "and permitted the Government to stand firm in plea negotiations with Yan and to provide a full picture of the pertinent bribery scheme to the Court." (*Id.*)  As the Government notes, Heidi provided this information "notwithstanding her prior friendship and work with Yan." (*Id.*)

  ii.  The fact that Ashe was considering a guilty plea, "which the Government was actively negotiating at the time of Ashe's untimely death." (*Id.* at 7.)  Had Ashe decided to proceed to trial, Heidi would have been a crucial witness at the trial, particularly because Mr. Lorenzo could not have described the full bribery scheme. (*See id.*)

  iii. Convincing Chi Ping Patrick Ho, a/k/a "Patrick Ho," who was charged in *United States v. Ho*, Crim. No. 17-779 (LAP), with Foreign Corrupt Practices Act and money laundering offenses, to agree to an important stipulation at his trial. (*See id.*)  As discussed in greater detail in the 5K Letter, Heidi was able to authenticate and place in context a call, recorded without their knowledge, where Ho and Yan described an illegal scheme. In no uncertain terms, the Government states that "[w]ithout [Heidi] Piao, it is highly unlikely that Ho would have agreed to this stipulation, and it would have been far more difficult—if not impossible—for the Government to authenticate and have the pertinent recording admitted into evidence and understood fully by the jury." (*Id.*)  A jury found Ho guilty on all counts, he was sentenced to 36 months' imprisonment, and the Second Circuit affirmed the convictions on appeal. (*See id.*)

*Second*, the information provided by Heidi was "'truthful[] . . . and reliab[le]." (*Id.* at 7 (quoting U.S.S.G. § 5K1.1(a)(2)).)  The Government never had reason to question the

completeness of Heidi's information or her candor.  As noted above, Heidi's cooperation was independently corroborated by other evidence, including documents and statements of others.

*Third*, Heidi's assistance was significant in scope and longstanding in duration.  As the 5K Letter states, Heidi "was always willing to meet or speak by phone, including with limited notice; answered questions, sometimes over lengthy proffer sessions, without any apparent effort to minimize; and consistently expressed remorse and took responsibility for her actions." (*Id.* at 6.)  Moreover, Heidi's cooperation was extensive.  In fact, she admitted to, and pleaded guilty to, the full scope of her tax-related conduct, "including that of which the Government was not previously aware and/or might have had difficulty proving beyond a reasonable doubt." (*Id.* at 7.)

*Fourth*, Heidi assumed significant danger, both to herself and her family in China, by cooperating.  Heidi's case was high profile, attracting media attention across the world, including in the United States, China, and Australia.   Heidi provided important and damaging information about influential players with political and financial power.  Nevertheless, Heidi assumed the risk of cooperation with the Government and was completely forthcoming.

*Fifth*, Heidi was the first defendant in this case to cooperate, and she waived indictment. (*See id.* at 6.)  Her cooperation could not have been timelier and directly facilitated the Government's investigation of more than one case, as discussed above.

Application of each of the § 5K1.1 factors supports a downward departure.  Heidi's cooperation was extensive, truthful, and essential to the Government's ability to develop compelling evidence of wrongdoing against multiple individuals.  Heidi provided invaluable cooperation that led to the Government's successful investigation and prosecution of other defendants.  Whether the Court make a formal downward departure under § 5K1.1 from the Guidelines or decide to issue a downward variance pursuant to § 3553, the result is the same: Heidi's significant cooperation supports a sentence of time served.

## IV.   HEIDI'S PHYSICAL CONDITION SUPPORTS A DOWNWARD DEPARTURE UNDER U.S.S.G. § 5H1.4 OR, IN THE ALTERNATIVE, A DOWNWARD VARIANCE PURSUANT TO 18 U.S.C. § 3553.

Heidi's current physical condition merits serious consideration by the Court.  Under § 5H1.4 of the Sentencing Guidelines, "[a]n extraordinary physical impairment may be a reason to depart downward . . . ."  U.S.S.G. § 5H1.4.  As detailed below, Heidi is ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Even absent the COVID-19 public health crisis, Heidi's physical condition is one that requires more than what the Bureau of Prisons ("BOP") can adequately accommodate.  Therefore, the Court should grant a downward departure under § 5H1.4, or in the alternative, a downward variance pursuant to § 3553(a) and sentence Heidi to time served.

### A.   Heidi's ██████████████ Constitutes an Extraordinary Physical Impairment

A defendant's specific medical history is relevant to a sentencing court's analysis of an appropriate sentence.  *See, e.g., United States v. Figueroa*, 421 F. App'x 23, 25 (2d Cir. 2011) ("[T]he district court conscientiously took [defendant]'s health into consideration, resulting in a sentence well below the bottom of the Guidelines range" where defendant's "individual circumstances" and "physical condition" merited a downward variance); *United States v. Hohn*, 443 Fed. App'x 931, 933 (6th Cir. 2011) ("[T]he district court considered Hohn's serious health conditions and granted a four-level downward departure based on his physical impairments."); *United States v. Vitela-Aragon*, No. CV-19-00028-TUC-JGZ, 2020 WL 1917192 at *2 (D. Ariz. Apr. 20, 2020) (noting how the court "granted downward departures of physical condition pursuant to U.S.S.G. § 5H1.4" at defendant's sentencing).

-7-





[redacted]

[redacted]

[redacted]

**B.     The COVID-19 Pandemic, Coupled with Heidi's Medical Condition, Makes a Prison Sentence Particularly Dangerous and Potentially Fatal.**

Heidi's physical health, standing alone, justifies a formal downward departure from the Guidelines under § 5K1.1 or, at a minimum, a downward variance under § 3553.  The COVID-19 pandemic has rendered Heidi's immunocompromised health even more precarious.  The safest course for Heidi is to continue doing what she is doing: remaining socially distant and only leaving her home to visit her doctors and undergo radiation treatment.  The additional risk to Heidi if exposed to COVID-19 while incarcerated threatens her health and livelihood and provides greater reason to sentence Heidi to time served.   Furthermore, although Heidi hopes to be vaccinated soon, even after she is vaccinated, she will still be susceptible to other illness based on her immunocompromised condition.

The Centers for Disease Control and Prevention ("CDC") has issued public statements that

Heidi's ███████████████████████████ render her immunocompromised and at higher risk for serious COVID-19 complications if infected.  As Heidi has seen firsthand when she was hospitalized for several days in September 2020 ██████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Any period of incarceration could have severe consequences for someone with Heidi's physical health.   Courts understand the severity of the health risks for immunocompromised inmates: "[T]he crowded nature of municipal jails such as the facility in which [defendant] is housed present an outsize risk that the COVID-19 contagion, once it gains entry, will spread . . . .  [A] high-risk inmate who contracts the virus while in prison will face challenges in caring for himself."  *United States v. Hernandez*, 451 F. Supp. 3d 301, 304–05 (S.D.N.Y.    2020)    (granting    defendant's    compassionate    release    motion).[11]    An immunocompromised inmate cannot guarantee his or her welfare in an institutional setting as it is not possible "to isolate himself in this institutional setting as recommended by the CDC . . . . [D]etaining [a medically vulnerable inmate] . . . in close quarters with others poses a very serious

---

[11]    *See also id.* (citing, *inter alia*, *United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (granting bail application, pursuant to § 3142(i), of 65-year-old defendant with COPD, in light of 'unique confluence of serious health issues and other risk factors facing this defendant, . . . which place him at a substantially heightened risk of dangerous complications should [he] contract COVID-19')).

risk to his health that the court . . . is taking into consideration." *United States v. Ramos*, 450 F. Supp. 3d 63, 65 (D. Mass. 2020) (granting motion for pretrial release based on defendant's COVID-19 risk factors from diabetes and asthma).

Courts in this District, and indeed across the country, recognize the severity of COVID-19 outbreaks in prisons when rendering sentencing decisions.  In *Basank v. Decker*, for example, the court noted how the risk of inmates contracting COVID-19 "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."  449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020) (citations omitted).  The court took judicial notice that, "for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality."  *Id.*  ("Courts have also recognized this health risk to be particularly acute—and of constitutional significance—for inmates who are elderly or have underlying illnesses."); *see also United States v. Zukerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (granting defendant's motion for compassionate release and stating, "When the Court sentenced [defendant], the Court did not intend for [defendant's] sentence to 'include a great an unforeseen risk of severe illness or death' brought on by a global pandemic." (internal citations omitted)).

The CDC warns that preventative measures available to those not incarcerated, such as social distancing, are simply unavailable to the prison population, because "[i]ncarcerated and detained people spend almost all of their time within congregate environments where groups of people share the same space, which increases the chance for COVID-19 to spread once introduced."[12]  Federal courts understand that "[m]any of the recommended measures to prevent infection are impossible or unfeasible in prison" and that "[p]risons are ill-equipped to prevent the spread of COVID-19."  *United States v. Rodriguez*, 451 F. Supp.3d 392, 402–03 (E.D. Pa. 2020) (citing studies conducted by an infectious disease epidemiologist in detention settings); *see also*

---

[12]  *FAQs for Correctional and Detention Facilities*, CDC (Jan. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html#accordion-5fd10f075cc9c-card-1.

*Zukerman*, 451 F. Supp. 3d at 335 ("Given that inmates . . . live in close quarters, social distancing is impracticable if not impossible, making it difficult for [defendant] to protect himself from the spread of this dangerous and highly contagious virus."); *see also United States v. Campagna*, No. 16 Cr. 78-01 (LGS), 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (granting defendant's motion for compassionate release because "Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the [facility].").

Because of the "extraordinary and compelling" risks COVID-19 poses to those currently incarcerated, federal courts have granted a large number of compassionate release motions and reduced inmates' sentences to time served.  *See, e.g., United States v. Austin*, 468 F. Supp. 3d 641, 645 (S.D.N.Y. 2020) (granting defendant's motion noting "[t]he ongoing coronavirus pandemic is another factor that weighs in favor of release"); *United States v. Phillips*, 469 F. Supp. 3d 180, 184 (S.D.N.Y. 2020) (granting defendant's motion, citing to defendant's increased risk from his hypertension and his complete rehabilitation as reasons for sentence reduction); *United States v. Smith*, 454 F. Supp. 3d 310, 311, 315 (S.D.N.Y. 2020) (granting defendant's motion due to his advanced age, compromised health, and status as a "high-risk" inmate vulnerable to COVID-19); *United States v. Simon*, No. 18 Cr. 390-15 (PAE), 2020 WL 5077390, at *3 (S.D.N.Y. Aug. 27, 2020) ("[Defendant's] serious medical conditions, [including prostate cancer], compounded by his age, indeed distinguish him from the vast majority of defendants . . . [a]nd the Government, to its credit, forthrightly recognizes that [defendant] is at a significantly heightened risk of complications from COVID-19 compared to the average person incarcerated . . . .").[13]

---

[13]   *See also United States v. Flores*, 465 F. Supp. 3d 251, 252–54 (W.D.N.Y. 2020) (citing defendant's medical issues of obesity and a prior cancer episode as making her "somewhat vulnerable to the spread of the virus," the record

COVID-19 poses serious health risks to those incarcerated and courts in this District recognize that "the best – perhaps the only – way to mitigate the damage and reduce the death toll [of COVID-19] is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, 450 F. Supp. 3d 491, 492 (S.D.N.Y. 2020) (citations omitted). In Heidi's case, it would be equally justified for this Court to impose a sentence of time served because the significant risks caused by the pandemic are unlikely to subside by the time Heidi would be due to surrender to the BOP if given a custodial sentence. Studies show that an inmate is 5.5 times more likely to contract COVID-19 than the average U.S. citizen is.[14] Moreover, even with the BOP's current efforts to vaccinate inmates and staff, rates of infection persist: as of February 18, 2021, 1,731 federal inmates and 1,657 BOP staff have tested positive for the virus.[15]

We respectfully submit that a sentence of time served is the most fair, just, and appropriate sentence considering Heidi's severe medical condition and the risk that imprisonment would pose to her.

## V.      APPLYING THE SENTENCING CONSIDERATIONS

Section 3553(a) directs the district court "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of federal sentencing law. The sentence imposed should: "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct; . . . [and] to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). In determining the sufficient sentence, sentencing courts should consider: (1) "the nature and

---

of infection at defendant's facility, and BOP's "neglect to deal with it" as reasons warranting a reduction in her sentence to time served); *Tidwell*, 476 F. Supp. 3d at 73–74 ("[T]he government concedes that [defendant's] cancer, combined with the COVID-19 pandemic, renders him 'less able to protect himself against an unfavorable outcome from the disease'").

[14]   *See* Brendan Saloner, Ph.D., et al., Research Letter, *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA Network (July 8, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2768249.

[15]   *See             COVID-19        Cases,        Fed.        Bureau        of        Prisons*, https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases&text=There%20are%202%2C804%20federal%20inmates,attributed%20to%20COVID%2D19%20disease (last visited Feb. 19, 2021).

circumstances of the offense and the history and characteristics of the defendant;" (2) the range of sentences available; (3) "the need to avoid unwanted sentencing disparities among defendants who have been found guilty of similar conduct;" and (4) "the need to provide restitution to any victims of the offense." *See id.* § 3553(a). These pragmatic considerations provide a court with the necessary to tools to impose a sentence which is reflective of the goals of sentencing: retribution, deterrence, incapacitation, and rehabilitation. *Tapia v. United States*, 564 U.S. 319, 325 (2011) (discussing four sentencing goals).

The Supreme Court has held that the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220 (2005). Sentencing courts "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)). When determining the appropriate sentence, the Guidelines are to serve as merely one of the considerations, along with the sentencing factors set forth in 18 U.S.C. § 3553(a).[16] Indeed, the applicable Guidelines range only "nudges [the judge] toward the sentencing range, but [her] freedom to impose a reasonable sentence outside the range is unfettered." *United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011) (citations omitted).

The Supreme Court has further instructed that "the judge may determine . . . that in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing," thereby explicitly affording district courts the discretion to render a sentence below the minimum suggested by the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 91 (2007). The Court has since reaffirmed "the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). "Highly relevant—if not essential—to [the] selection of an

---

[16]    The Guidelines should not be assigned any "presumptive weight" over the other factors set forth in § 3553(a). *United States v. Langford*, 516 F.3d 205, 223 (3d Cir. 2008) (Weis, J., dissenting); *see also United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) ("[T]he requirement to consider § 3553(a) factors 'is *not* synonymous' with any requirement that a particular factor 'be given determination or dispositive weight' in the identification of the appropriate sentence." (citations omitted)).

appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* (quoting *Williams*, 337 U.S. at 247). The Court has rejected the need to find extraordinary circumstances before issuing a sentence outside the Guidelines range. *Gall*, 552 U.S. at 47. Rather, district courts are to "consider all of the § 3553(a) factors to determine whether they support the sentence requested." *Id.* at 49–50.

The Second Circuit has noted that "[a] sentence outside the Guidelines carries no presumption of unreasonableness." *Stewart*, 590 F.3d at 143 (citation omitted). In fact, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d. Cir. 2008) (footnote omitted).

*Booker* and its progeny expressly direct the Court to take into account, under § 3553(a), not merely the conduct that led to Heidi's guilty plea, but also the quality of her character, the impact she has on those around her, and the effect of any sentence on the well-being of her family and community. Consideration of all of the factors under § 3553(a) demonstrates that no term of imprisonment is necessary or appropriate to serve the goals of sentencing.

**A.** **The § 3553(a)(1) Factors Support a Downward Variance.**

  *i.*   *Nature and Circumstances of the Offense*

Heidi freely admits to passing bribes to Mr. Ashe. She stated the following in her plea allocution to the Court:

> Beginning in or around the spring of 2012, I agreed with other individuals to give money to John Ashe, who was the Permanent Representative to the United Nations from Antigua, and from September 2013 to September 2014, the President of the UN General Assembly.

> The monetary payments were made with the intent of influencing John Ashe, including in his official capacity – for example, so he would influence other officials and attend a conference in his official UN capacity. The payments also included money that was intended to pay officials in Antigua to influence their official actions – for example, so the officials would enter into a contract with a foreign company.

-15-

> In order to make the payments to John Ashe, I participated in meetings in Manhattan and knowingly assisted in the transferring of money from a foreign bank account to a U.S. bank account. The transactions exceeded $5,000.00, and payments were wired to bank accounts in New York.
>
> Additionally, in 2014 and 2015, I knowingly failed to file a Report of Foreign Bank and Financial Accounts (FBAR) disclosing that I had financial interests in foreign bank accounts. At least one of those bank accounts had a total value of more than $10,000.00, and I know that I should have disclosed the accounts to the IRS.

(Plea Hearing Transcript, 24:17–25:14.)

More specifically, the Complaint alleged, and Heidi freely admits, that Heidi and Ms. Yan participated in a conspiracy to arrange bribe payments solicited by, and bound for, Mr. Ashe, and originated from Chinese businessmen who sought to obtain government contracts in Antigua and elsewhere. (*See* Compl. ¶ 44.) Mr. Ashe received the illicit payments into a bank account he created bearing the name "PGA" or "President of the General Assembly," but was controlled entirely by himself to fund his personal expenses. (Compl. ¶ 12.) The Complaint alleged that Heidi and Ms. Yan were involved in three different sets of bribes. First, Heidi and Ms. Yan arranged to make a $300,000 payment from "CC-1," a "Chinese media executive," to one of the account that Mr. Ashe had set up for himself. (*See* Compl. ¶¶ 45, 45a–d.) Mr. Ashe characterized the payment that Ms. Yan and Heidi had arranged as "PGA funding" and "contributions," but also "a show of 'good faith'" by CC-1 that would enable Mr. Ashe to "start the conversation" with Antiguan officials, including the Antiguan Prime Minister, regarding the business aspects of [CC-1's] initiatives for Antigua and Barbuda. (Compl. ¶¶ 45b, e–g.) Heidi and Ms. Yan acknowledged the emails of Mr. Ashe that described his endeavors in Antigua, thanking him and stating that they had relayed his "good news" back to CC-1. (Compl. ¶ 45h.)

Second, the Complaint alleged that after Mr. Ashe was elected President of the General Assembly, in June 2013, Ms. Yan and Heidi began sending $20,000 monthly to an account Mr. Ashe identified as his personal bank account. (Compl. ¶¶ 47, 47a–c.) In addition, the Complaint stated that after Mr. Ashe assumed the Presidency, in the fall of 2013, Ms. Yan and

Heidi arranged for "CC-2," a "Chinese security technology executive," to send approximately $100,000 to one of the PGA accounts set up by Mr. Ashe to pay for a reception for Mr. Ashe. (Compl. ¶ 48.)  The Complaint implied that in December 2013, Ms. Yan and Heidi arranged a second payment to one of the "PGA" accounts set up by Mr. Ashe on behalf of the Chinese security company.  (Compl. ¶ 48j.)  After receiving the payment, Mr. Ashe purportedly arranged meetings between executives of the Chinese security company and officials in Antigua, which resulted in a signed memorandum of understanding.  (Compl. ¶ 48l–n.)

Third, the Complaint alleged that Ms. Yan and Heidi arranged a $200,000 payment to one of the PGA accounts opened by Mr. Ashe in exchange for him making an official appearance at a conference in China being organized by a Chinese real estate developer, identified as "CC-3." (Compl. ¶ 49.)  The Complaint stated that Mr. Ashe purportedly appointed Ms. Yan and Heidi as "Advisers" in "Economic Matters" to the Office of the President of the General Assembly and as "Advisers" to the Office of the Prime Minister of Antigua and Barbuda in matters pertaining to investments in Antigua.  (Compl. ¶ 49e.)

While Heidi accepts full responsibility for her conduct, she respectfully requests that the Court include the following facts in its consideration of the nature and circumstances of the offense.  Most importantly, Heidi did not financially benefit from her conduct.  She was a go-between, with the bribe money originating from wealthy Chinese businessmen and ending up in the hands of Mr. Ashe and his colleagues in Antigua and Barbuda.  Heidi did not receive a single dollar in exchange for her involvement.  If a business venture had materialized, Ms. Yan and Heidi hoped to eventually make some income for having served a go-between, but because nothing came to fruition, Heidi earned nothing.  Moreover, Heidi was not the mastermind, or even a primary participant, in the overall conspiracy.  Even putting aside the conduct of the key defendant in this matter, Ng Lap Seng (whom Heidi has never met or otherwise interacted), and looking only at the conduct where Heidi is implicated, she was, at worst, a puppet.  Heidi looked up to Ms. Yan and

was willing to do whatever Ms. Yan instructed.  Ms. Yan was the "face" of the partnership, and Heidi followed instructions behind the scene.  Heidi was similarly dazzled by Mr. Ashe and the allure and reputation of the UN.  She was flattered by Mr. Ashe's attention and impressed by his title and prestige, and similarly eager to please him and Ms. Yan.  As a result, Heidi made decisions she knew to be wrong in order to support Ms. Yan and Mr. Ashe.

Furthermore, Heidi acknowledges that her failure to file FBARs disclosing her financial interests in foreign bank accounts was irresponsible.  As the Government states in its 5K Letter, Heidi readily admitted that she informed her U.S.-based accountant that she only had one foreign bank account, when in fact, she had multiple such accounts.  (5K Letter at 7.)  Heidi has since amended all relevant tax returns to reflect this information.  She does not owe any restitution to the IRS, as the interest income earned on these accounts was *de minimis*.

Heidi offers the above background information to provide the Court with the relevant context to her offense.  She does not seek to excuse or minimize what she has done, and she appears before this Court fully acknowledging her wrongs.

### ii.     *History and Characteristics*

#### a.     *Heidi's Upbringing and Education*[17]

Heidi's parents raised her and her younger sister Grace in Beijing.  From a young age, they instilled in their daughters the importance of ethics and hard work.  Heidi's father was a medical doctor with a specialty in immunology, and her mother was a chemist.  When Heidi was seven years old, at the height of the Chinese Cultural Revolution of the late 1960's, her father was sent away to a Chinese labor camp.  Her father's absence at home forced Heidi to grow up and become very independent, and drove many of her future academic and professional accomplishments.

---

[17]   *See* Exhibit A, Statement of the Case, dated January 29, 2021.

From a young age, Heidi dreamed of studying in the United States. After graduating with a bachelor's degree in civil engineering from the most competitive university in China, Heidi received a scholarship to attend Michigan Technological University in Houghton, Michigan. She flew to the United States with only $100 in her pocket, reassuring her worried parents that "everything would work out just fine." (Letter from Grace Piao, dated February 4, 2021 ("Grace Piao Letter"), attached as Exhibit E, at 1–2.) Heidi graduated from Michigan in 1991 with a Master of Science degree in Civil Engineering. Heidi then naturalized in the United States in 1998. At the time, she was proud of her academic and professional achievements, and truly felt that she had succeeded in the land of freedom. Heidi also knew that she had made her parents and Grace proud.

### b.      *Heidi's Commitment to Her Family and Friends*

The underlying theme in the letters of support submitted on Heidi's behalf is clear: Heidi is a compassionate and loving person who always put her family and friends first. This is most clearly underscored through Heidi's quasi-maternal relationship with her younger sister Grace. Grace, who refers to Heidi as her "superhero," watched her older sister's passion and resilience over the years and wanted to follow her example, so with Heidi's support and encouragement, Grace also came to the United States for further education. (Grace Piao Letter at 2.) Grace was able to return some of the love and support Heidi had shown her

As Grace writes in her letter to the Court, "This is the kind of person Heidi is, selfless and always thinking for others. It was her optimism and high spiritedness during her treatment which made me believe that we would get through the difficult time." (*Id.*)

Heidi has always been the rock of her family.  ███████████████  Heidi received the heartbreaking news that her father had been diagnosed with kidney cancer.  Instead of putting her own health and fears first, or allowing grief to consume her, "Heidi showed her strength and perseverance throughout [her] father's battle with cancer."  (*Id.*)  As the head of her family after her father, Heidi took the lead in coordinating his treatment ██████████████████ ██.  (Exhibit A, at 4.)  Sadly, her father succumbed to the disease in 2013.  (*Id.*)

Heidi's selflessness and compassion for others extends beyond her family.  She is someone others rely on, whether or not they ask for help in the first place.  Heidi breaks from the stereotypes of a traditional business person, and always makes time for others, despite how demanding her own schedule may be.  Those who know her best describe her as "a role model," (Letter from Hong Yang, dated January 21, 2021 ("Yang Letter"), attached as Exhibit F, at 1), who is "honest and trustworthy" (Letter from Dandan Zhang, dated X ("Zhang Letter"), attached as Exhibit G, at 1).

Heidi's kindness and selflessness has not faltered over the years—and she made good on her lifelong commitment to making a future for herself where she could give back to her family.  Excerpted below are several testimonials to provide the Court with a better sense of Heidi's character from those who truly know her.

- "I . . . regard [Heidi] as the auntie I've never had.  Heidi has been an instrumental part of my formative years, and . . . [a] safe harbor to turn to for protection and love when [my father was charged with corruption], . . . [m]y mother was blacklisted and my family was immediately cut off on all fronts . . . .  Heidi was the first, and only, person who anxiously looked for my mother and me . . . .  [Heidi] packed as much daily necessities for us as possible and flew across to America to visit us in person.  This is essentially who Heidi is – someone with a big heart filled with authentic love, genuine care, and a willingness to sacrifice herself for the betterment of those she loves."  (Letter from Nini Suet, dated January 2021 ("Suet Letter"), attached as Exhibit H, at 1–2.)

- Heidi "is kind, caring, giving and has a big heart . . . .  She has a lot of compassion and empathy and often volunteers at shelters or at church.  When I learned that Heidi was in need of putting up collateral for her bail, I was willing to put up both of my homes to help and have for the entirety of the

case. I did this knowing the risk and consequences but because of our longstanding friendship and the faith I have in her, I was confident and have the utmost trust in her." (Letter from Jessica Yune, dated January 19, 2021 ("Yune Letter"), attached as Exhibit I, at 1–2.)

- "[I]n 2001 during 9/11 attack in NYC, . . . Heidi and I were . . . in Beijing . . . [and] [w]hat worried me on a personal level is my husband . . . was on a United Airline flight [headed to] Newark [that] afternoon. Heidi knew I had two young boys at home, so she insisted on staying with us and keeping us company so that I would not be alone and too worried . . . . I will never forget the generous and kind-hearted comfort Heidi gave us during that long and excruciating night." (Letter from Wu Hua, dated August 31, 2020 ("Hua Letter"), attached as Exhibit J, at 1–2.)

- "Heidi is a trusted person in my life, I consider her family . . . . She goes above and beyond the call of duty for a friend. Heidi also takes care of her elderly Mom, and always thinks of others first before herself." (Letter from Sean Gavigan, dated January 19, 2021 ("Gavigan Letter"), attached as Exhibit K, at 1.)

- "My career and life have been deeply influenced by Heidi and I have always been appreciative and grateful of having her in my life." (Letter from Xiaopu Huang, dated August 12, 2020 ("Huang Letter"), attached as Exhibit L, at 1.)

- "I believe Heidi is a genuinely good person, with a big heart . . . [and] [w]henever we visit her, she always goes out of her way to make us feel at home and welcomed, no matter the occasion, or how busy her schedule is." (Letter from Duke Diep, dated January 19, 2021 ("Diep Letter"), attached as Exhibit M, at 1.)

- "My oldest son (Ryan) . . . was diagnosed with having Asperger's Spectrum Disorder. During Ryan's younger years, . . . Heidi exercised tremendous patience and love as she played games with Ryan and took him to the park . . . [and] to this day they both have a strong bond together . . . . [This] epitomizes the character of Heidi and her special love for people and those less fortunate. Heidi has always gone the extra mile." (Letter from Glenn Camp, dated January 31, 2021 ("Camp Letter"), attached as Exhibit N, at 1–2.)

These letters underscore Heidi's loyalty and commitment to her family and friends. In light of Heidi's lifelong dedication to those around her and her never-ending efforts to make life better for her family and friends alike, these letters plead for leniency. The outpouring of support from her family and friends demonstrates that Heidi will continue to be a valuable asset to society. Heidi's past and present establish that she is someone who accepts responsibility and works

diligently to learn lessons from those mistakes moving forward.  There is no reason to believe that Heidi will not create a positive outcome and become a better person because of this, her hardest lesson yet.

### c.     Heidi's Professional Career

Heidi's business career has been varied in both scope and industry, and she has spent time living in both China and the United States.  She spent much of her career acting as a "bridge" between western businesses and the eastern market (specifically, China), providing consulting and advisory support to U.S. companies seeking to explore Chinese markets, including oil and gas, telecommunications, and finance.  She worked for companies including Higoal.com, a sports vertical website that eventually merged with Disney- and Newscorp-owned ESPNSTAR.com.cn, and eChinaCash, a leading provider of customized database management and a customer loyalty solution platform.  In 2008, Heidi left eChinaCash and joined her longtime friend and colleague Ms. Yan who was in the process of founding the Australia China Club (ACC). The ACC was an entity intended to provide a bilateral high-level communication platform to the government and business sectors in Australia and China, never took off.  Ms. Yan then had the idea to enter the U.S. market, and so she founded the GSDF, as discussed above in Section II.A. Heidi joined Ms. Yan in this venture, which then gave rise to the conduct at issue before the Court.

### d.     Heidi's Commitment to Community Service

Prior to the COVID-19 pandemic, Heidi had been trying to make partial amends for her actions through community service.  Beginning in January 2017 and continuing through to February 2020, immediately before the COVID-19 pandemic, Heidi volunteered more than 320 hours of service to City Harvest, an organization that provides millions of pounds of fresh produce to community members.  (City Harvest Letter dated February 1, 2021, attached as Exhibit Q; *see also* City Harvest Volunteer Record, January 2017 through February 2020, attached as Exhibit R.) Heidi participated in City Harvest's Mobile Market food distribution programs, Cooking

Demonstrations, Greenmarket and Food Show food rescues, and produce repacks.  (*Id.*)  Indeed, the City of New York's Mayoral Service Recognition Program awarded Heidi with a certificate of recognition for her volunteer efforts in 2018.   (City of New York Service Certificate of Recognition, attached as Exhibit S.)

Giving back to those less fortunate comes naturally to Heidi.  In a letter to the Court, a close friend recounts how, before the pandemic, Heidi "would usually end our nights out . . . by about nine o'clock so that she could be up before dawn to feed the hungry at a local food bank – and as we walked her back to her apartment . . . she would find a homeless person and give that person her leftover dinner." (Letter from William Peiffer, Esq., dated September 3, 2020 ("Peiffer Letter"), attached as Exhibit O, at 1-2.)  While Heidi recognizes that community service does not "right" her wrongs, she hoped to immediately begin paying back society, at least in part, for her improper conduct.  Heidi's commitment to service surely will continue beyond her sentencing by Your Honor.

### e.    *Heidi's Health*

For the sake of brevity, we do not restate Heidi's serious medical condition, and instead cross-reference Section IV above.  Whether the Court factor in Heidi's health in the form of a downward departure under § 5H1.4 of the Sentencing Guidelines or as a downward variance pursuant to 18 U.S.C. § 3553(a)(1), the result should be the same: Heidi's medical condition warrants a sentence of time served.

### f.    *Heidi's Remorse*

As reflected in her Statement of the Case, Heidi accepts full responsibility for her illegal conduct, and deeply regrets the decisions that she made.  Even in Heidi's darkest hour, she has remained optimistic and supportive of others, all while acknowledging that what she did was against the law and seeking forgiveness from those around her.  When Heidi's sister first heard of Heidi's arrest, she was in complete denial and devastated.  (Grace Piao Letter, at 2.)  Grace felt

like "the sky had fallen on [her]," but it was Heidi who brought her down to earth by expressing "her deep contrition for what she had done, and apologized for the humiliation and damage her misconduct has caused." (*Id.*) Heidi told her sister of her mistakes and her ignorance of the law, asking for Grace's forgiveness. (*See id.*) As Grace writes in her letter, "I understand Heidi's wrongdoing bears consequences, but it's clear that she has a complete remorse for what she has done, and has taken full responsibility for her mistakes. She has learned a hard lesson." (*Id.*)

As evident in the following excerpts from the letters submitted to the Court, Heidi's remorse is apparent to her friends and family:

- "[This] was the first time I saw Heidi so incredibly defeated and remorseful. Heidi never once tried to justify her actions; instead, she expressed sincere regret, disappointment in herself and full respect for the legal proceedings . . . . It is clear that Heidi is fully determined to learn from her past, take responsibilities for her mistakes, and embrace a brighter future." (Suet Letter at 2.)

- Heidi "takes full responsibility and is sincerely remorseful . . . . Her respect for the professionalism of judges and attorneys is genuine, and her resolve to rehabilitate authentic . . . . Giving her a second chance will mean the world to her, allowing her to contribute back to society." (Letter from Weiping Wu, dated March 26, 2020 ("Wu Letter"), attached as Exhibit P, at 1–2.)

- "After this unfortunate fall of hers, Heidi did not get beaten down and despair, she admitted the wrongdoings and chooses [sic] to face the consequences. She has been actively trying to amend the wrongdoings by regularly participating in volunteer work for the community, and trying to work even hard to make a [sic] living." (Yang Letter at 2.)

- "[N]o matter how much hardship she has brought to her friends and family, she has been the emotionally supportive in everything we do . . . . Her constant regret and remorse for her actions, along with the pain and extra burden she asks of from her friends and family, will forever live with her the rest of her life." (Diep Letter at 1.)

- "Heidi genuinely regrets the mistake she has made and wishes that she could turn back time and not done what she's done. It has consumed her with regret and the burden she will carry with her forever." (Yune Letter at 2.)

- "Heidi truly regrets the mistakes that she has made, she openly admits that she has made mistakes, even privately with her friends, and seeks to move forward and to be better; she seeks to not make such mistakes again." (Huang Letter at 1.)

-24-

- "I have witnessed first-hand for the last 5 years, Heidi's remorse, pain, regret, financial deterioration, pain-staking worry for her aging mom (who remains alone in China) and how this has affected her life. Heidi's actions have repeatedly confirmed to me the regret of her mistakes." (Camp Letter at 2.)

**B.    The 3553(a)(2)–(7) Factors Support a Downward Variance.**

*i.    Reflecting the Seriousness of the Offense*

Section 3553(a)(2) instructs sentencing courts to assess the need to impose a particular sentence in order to reflect the seriousness of the offense, provide just punishment, and afford adequate deterrence. While Heidi does not seek to minimize her criminal conduct, § 3553(a)(2)(A) instructs the Court to consider the seriousness of her offense. The Guidelines are designed to calculate the "seriousness" of a defendant's criminal offense relevant to other offenses within that same category. *See* § 3553(a).

Following her arrest, Heidi spent seven weeks detained at MCC. Since her release on bail in November 2015, and up until this very day, Heidi has abided by each and every restriction required by the conditions of her bail, which have included, for some or all of the time: home detention, an electronic ankle monitor, a daily curfew, frequent reporting to Pretrial Services, and travel restrictions. Heidi has not been to her home in China in over five years, and she has not seen her elderly mother in nearly four years (when her mother was last able to travel to the United States). Simply put, Heidi has more than served a punishment reflecting the seriousness of the offense.

*ii.    General and Specific Deterrence*

Further incarceration, beyond the time Heidi already served following her arrest, is not necessary to achieve general or specific deterrence, pursuant to § 3553(a)(2)(B). As for general deterrence, a non-custodial sentence will send a message that involvement in illegal activity will carry consequences. The risks of a felony conviction and probation or home confinement are sufficient to deter the general public from committing similar crimes. *See United States v. Tomko*, 562 F.3d 558, 569 (3d Cir. 2009) (affirming non-custodial sentence for a tax fraud conviction in

which the district court determined that the sentence "address[ed] the sentencing goals of punishment, deterrence and rehabilitation"); *see also United States v. Jordan*, 582 F.3d 1239, 1251–52 (11th Cir. 2009) (concluding that the district court did not abuse its discretion by imposing a non-custodial sentence in a public corruption prosecution because the conviction, sentence, resulting public humiliation, monetary cost of the defense, and loss of future earning power would deter similar conduct). Heidi's timely notification of her intent to enter a guilty plea, her acceptance of responsibility, and the substantial assistance she provided to the government in its investigation support the position that a non-custodial sentence is adequate to accomplish the necessary goal of general deterrence.

Specific deterrence is also satisfied without a prison sentence. There is no realistic possibility that Heidi will re-offend. She has no prior criminal history. This experience has brought nothing but shame and misery to Heidi. Heidi has already personally and professionally suffered as a result of her unlawful conduct.

### iii.   *Unlikelihood of Recidivism*

While Heidi realizes that she must be punished for this violation of the law, a period of further incarceration is not necessary to deter her from engaging in future illegal conduct. Furthermore, considering the need for the sentence imposed "to protect the public from further crimes of the defendant," pursuant to § 3553(a)(2)(C), Heidi is unlikely to commit future crimes. Heidi has never engaged in illegal conduct in the past, she has lived a law-abiding life, and she has learned her lesson. Simply put, recidivism is not an issue in this case. *See* Transcript of Sentencing at 7:11–10:19, *United States v. Campbell*, 12-cr-0569 (GBD) (S.D.N.Y. 2014), ECF No. 70 (imposing a sentence of one year and a day after trial on 55-year-old defendant with no prior criminal history, where Guidelines range was 41 to 51 months); *United States v. Acosta*, No. 06-cr-172, 2008 WL 4867815, at *1–2 (E.D.N.Y. Sept. 8, 2008) (reducing from a Guidelines range of 63 to 78 months' imprisonment to a five-year probation sentence with a fine of $125,000, noting

that defendant had "generally lived a law-abiding life"); *United States v. McKillop*, No. 06-cr-336, 2008 WL 4862381, at *1–2 (E.D.N.Y. Sept. 8, 2008) (reducing from a Guidelines range 210 and 240 months, to a five-year probation sentence and 250 hours community service, noting, among other things, that defendant had "generally lived a law-abiding life").

### iv.    Availability of Non-Custodial Sentences

Sections 3553(a)(3) and (4) direct the courts to consider the kinds and ranges of sentences available.  To the extent the Court determines that some level of punishment, above and beyond the sanctions attendant to supervised release, is required in the present circumstances, alternatives to a period of straight incarceration exist.  For example, a term of probation or community service would be fair and reasonable.  Since her arrest, Heidi has made extensive community contributions, as discussed above in Section V.A.ii.d.  Further, home confinement is a sentencing alternative available to the Court, as is service of a term at a halfway house. Nonetheless, the defense respectfully submits that both probation and a term at a halfway house would be unduly punitive, would impose undue hardship on Heidi, would shoulder society with an unnecessary cost, and would send a harsher than necessary message to the community at large.

### v.    Avoidance of Unwarranted Sentencing Disparities

Section 3553(a)(6) instructs courts to consider the avoidance of unwarranted sentencing disparities.[18]   Under this directive, courts must take into account the sentencing practices of other courts.  Loss is not a good measure of the seriousness of the offense in this case. *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (noting that the amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [] moral seriousness . . . or the need for deterrence").  As a number of courts and commentators have noted, because they have numerous overlapping enhancements and give undue significance to the amorphous concept of "loss," the Guidelines for white-collar crimes can often produce advisory

---

[18]    Section 3553(a)(5) instructs courts to take into account any pertinent policy statement issued by the Sentencing Commission.  Counsel is not aware of any such statements applicable to the offense in this case.

sentencing ranges that are indisputably far "greater than necessary" and lack any common sentencing wisdom.  *See United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that the Guidelines for white-collar crimes can produce "a black stain on common sense"); Andrew Weissmann & Joshua Block, *White-Collar Defendants and White-Collar Crimes*, 116 YALE L.J. POCKET PART 286 (2007) (former federal prosecutors asserting that "the current Federal Sentencing Guidelines for fraud and other white-collar offences are too severe" and are greater than "necessary to satisfy the traditional sentencing goals of specific and general deterrence – or even retribution"); David Debold, *Assessing Booker and Its Aftermath*, PRAC. FED. SENT'G GUIDELINES § 1.02 (2011) ("The importance and impact of a district court's discretion in the area of white collar offense sentencing cannot be overstated.  In certain white collar cases in which the determined 'loss' amount is high, the Guidelines produce sentences that are extremely long – longer than those for some of the most serious violent offenses – and arguably disproportionate to any sense of reasonable punishment.").

Courts across the country, recognizing that they are poorly served by the Guidelines for high-loss white-collar offenses, consistently impose and approve below-Guidelines sentences in such cases.  *See, e.g.*, *United States v. Ferguson*, 584 F. Supp. 2d 447, 456 (D. Conn. 2008) (imposing sentences ranging from one year and one day to four years on five defendants convicted of fraud leading to over $500 million in loss, and whose Guidelines ranges were life imprisonment); *United States v. Burgos*, Crim. No. 12-49, 2015 WL 6447766, at *3–6 (N.D. Ind. Oct. 23, 2015) (granting a "five-level downward variance" to a defendant charged with passing a fictitious check where the amount of loss overstated defendant's fraudulent conduct); *United States v. Turkcan*, Crim. No. 08-428 (E.D. Mo. June 11, 2009) (imposing a sentence of a year and a day in a bank fraud case involving a loss of approximately $35 million).  Here, even assuming a loss amount of more than $550,000 but less than $1,500,000, as calculated by the PSR, the above-discussed cases demonstrate that a below-Guidelines sentence is appropriate in this case.

Moreover, the sentences imposed on the other defendants in this case support a sentence of time served for Heidi.[19]  Ms. Yan, who was the mastermind of the scheme in which Heidi was involved, provided *no* cooperation to the Government and Your Honor imposed below-Guidelines sentence of 20 months in prison.  Francis Lorenzo, who provided cooperation to the Government (though he did not do so as freely and promptly as Heidi), received a below-Guidelines sentence of time served and supervised release.  Further, the Court recently granted Mr. Lorenzo's unopposed request to terminate his two years' supervised release after serving one year.  A sentence of time served will avoid unwarranted sentencing disparities in this case.

### vi.   Restitution

The final consideration under § 3553, as set forth in subsection (a)(7), concerns the need for restitution.  Although there is no restitution to be paid in this case, Heidi owes a civil penalty to the IRS for her failure to file FBARs.  Defense counsel is in ongoing discussions with the IRS to work towards agreeing on an installment plan so that Heidi can pay the penalty as soon as practicable.  If Heidi is sentenced to time served, she will be able to earn money through continued employment to satisfy the penalty over time.

## VI.   SPECIFIC SENTENCING REQUEST

For all of the reasons discussed above, we respectfully ask this Court to grant a downward departure under U.S.S.G § 5K1.1 on the basis of Heidi's substantial cooperation to the Government and § 5H1.4 on the basis of Heidi's extraordinary physical health.  In addition, or in the alternative, we ask the Court grant a downward variance pursuant to the considerations of 18 U.S.C. § 3553, and sentence Heidi to time served plus supervised release.  Time served is appropriate given "the nature and circumstances of the offense and the history and characteristics

---

[19]   We respectfully submit that the sentences imposed on defendants Ng Lap Seng and Jeffrey Yin are not relevant, as Heidi had no dealing with either defendant or involvement in their purported conduct.  Even assuming the Court considers their sentences, we nonetheless find that they support a non-custodial sentence for Heidi.  Mr. Ng, who was convicted after a jury trial, faced a Guidelines range of 235 to 293 months' imprisonment and was sentenced to four years in prison.  Mr. Yin, who entered a guilty plea but did not provide any cooperation to the Government, faced a Guidelines range of 24 to 30 months' imprisonment and was sentenced to a year and a day in prison.

of the defendant," § 3553(a)(1), and is "sufficient, but not greater than necessary, to comply with the purposes set forth in [§ 3553(a)(2)]" – specifically, "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant[.]"

        As demonstrated above, Heidi is a well-respected and upstanding member of society whose offense is truly aberrational.  She made a serious mistake, but has learned from it and will not repeat it.  Heidi feels a tremendous sense of remorse and regret; she has already suffered greatly and will spend the rest of her life trying to make amends for her misconduct.  A sentence of time served is most appropriate and economical in this case.

Respectfully submitted,


/s/ Jamie Gottlieb Furia
Jamie Gottlieb Furia
Michael B. Himmel
**Lowenstein Sandler LLP**
1251 Avenue of the Americas
New York, New York  10020
212.262.6700
jfuria@lowenstein.com
mhimmel@lowenstein.com

Attorneys for Defendant Heidi Hong Piao

February 19, 2021